J-S28010-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MARTY WILLIAM MANESS | : | |
| | : | |
| Appellant | : | No. 439 MDA 2022 |

Appeal from the PCRA Order Entered February 24, 2022
In the Court of Common Pleas of Fulton County Criminal Division at
No(s): CP-29-CR-0000143-2016

BEFORE: OLSON, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY OLSON, J.: **FILED NOVEMBER 30, 2022**

Appellant, Marty William Maness, appeals from the February 24, 2022 order denying his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. Counsel for Appellant, Mark F. Bayley, Esquire ("Attorney Bayley") filed a brief and a motion to withdraw as counsel pursuant to **Anders v. California**, 386 U.S. 738 (1967) and its progeny.[1] We

---

[1] **See Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009); **Commonwealth v. McClendon**, 434 A.2d 1185 (Pa. 1981).

Attorney Bayley's appellate brief filed pursuant to **Anders**, **supra**, is misplaced. A **Turner**/**Finley** no-merit letter or brief is required where counsel seeks to withdraw within the context of PCRA litigation. **See Commonwealth v. Widgins**, 29 A.3d 816, 817 n.2 (Pa. Super. 2011); **see also Commonwealth v. Turner**, 544 A.2d 927 (Pa. 1988); **Commonwealth v. Finley**, 550 A.2d 213 (Pa. Super. 1998). "Because an **Anders** brief provides greater protection to [an appellant], this Court may accept an **Anders** brief *in lieu* of a **Turner**/**Finley** [no-merit] letter." **Widgins**, 29 A.3d at 817 n.2.

affirm the order denying Appellant's petition and grant Attorney Bayley's motion to withdraw.

The PCRA court set forth the procedural history as follows:

This case arises from an incident [that occurred] on March 30, 2016, where an individual suffered a fatal overdose at [Appellant's residence]. As a result, [Appellant] was charged with [manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance, 35 P.S. § 780-113(a)(20),] and drug delivery resulting in death[, 18 Pa.C.S.A. § 2506(a),] on June 23, 2016.

On December 20, 2016, [Appellant] filed an *omnibus* pre[-]trial motion. He was represented by [] John J. Mooney[,] III[, Esquire ("Attorney Mooney")] at the time. A hearing was held on the matter on February 14, 2017. [On] April 4, 2017, [the trial court] denied [Appellant's] *omnibus* [] motion.

After a two-day jury trial on October 5[, 2017, and October] 6, 2017, [Appellant] was convicted of [the aforementioned] charges. [Appellant] was sentenced on October 31, 2017, to a term of 108[ to ]240 months' incarceration in a state correctional institution for his conviction of drug delivery resulting in death[. H]is remaining conviction merged for sentencing purposes.

On November 6, 2017, [Appellant] filed a motion for post-sentence relief. Subsequently, [Appellant] applied for, and was granted, the assistance of the public defender's office. Thus, Attorney Mooney ceased his representation of [Appellant], and [] Philip Harper[, Esquire ("Attorney Harper")] took over as counsel for [Appellant].

[On] April 3, 2018, [the trial court] denied [Appellant's] post-sentence motion. [Appellant] timely appealed on May 2, 2018. On December 21, 2018, [this Court] affirmed [Appellant's] judgment of sentence. [**See Commonwealth v. Maness**, 2018 WL 6715297 (Pa. Super. filed Dec. 21, 2018) (unpublished memorandum). Appellant did not seek discretionary review by

_____

As such, we accept counsel's **Anders** brief *in lieu* of a **Turner**/**Finley** no-merit letter and will consider it under the **Turner**/**Finley** standard.

our Supreme Court. Therefore, Appellant's judgment of sentence became final on Tuesday, January 22, 2019.[2]]

On August 26, 2019, [Appellant] filed a *pro se* [PCRA] petition, in which he indicated that he wished to proceed without an attorney. On August 28, 2019, [the PCRA court] scheduled a hearing in order to colloquy [Appellant] on the record about his right to counsel. After [conducting a] hearing on October 15, 2019, [the PCRA court] determined [Appellant] wished to have an attorney represent him and directed the court administrator to appoint counsel[. The PCRA court] also directed future counsel to review the record and determine whether [amendment of Appellant's *pro se*] petition was necessary. On October 18, 2019, [] Bret Beynon[, Esquire ("Attorney Beynon") was appointed to represent Appellant].

[Following the appointment of Attorney Beynon, no additional filings were submitted on Appellant's behalf. Accordingly, on March 3, 2020, the PCRA court] entered an order [] directing Attorney Beynon to file an amended petition or otherwise notify the [PCRA] court that none was necessary. On March 17, 2020, [Appellant] filed a counseled [amended PCRA] petition[.] On April 9, 2020, [the PCRA court] received the Commonwealth's answer to [Appellant's amended PCRA petition. The PCRA court] then scheduled an evidentiary hearing on [Appellant's] petition for June 16, 2020.

On June 16, 2020, after an on-the-record discussion, [the PCRA court] vacated Attorney Beynon's appointment as counsel for [Appellant] due to a conflict of interest and directed the court

---

[2] ***See*** 42 Pa.C.S.A. § 9545(b)(1) (stating, "[a] judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of the time for seeking the review"); ***see also*** 1 Pa.C.S.A. § 1908 (stating, whenever the last day of any period of time referred to in a statute "shall fall on Saturday or Sunday, or on any day made a legal holiday by the laws of this Commonwealth or of the United States, such day shall be omitted from the computation"); 5 U.S.C.A. § 6103(a) (listing the "Birthday of Martin Luther King, Jr, the third Monday in January," as a federal holiday). Pursuant to these statutory provisions, we omitted Monday, January 21, 2019, from the computation of the date on which Appellant's judgment of sentence became final.

administrator to appoint new counsel as quickly as possible[. The PCRA court] also directed future counsel [to] review the [amended PCRA] petition submitted by Attorney Beynon and determine if any motions must be filed [to prepare the matter] for a[n evidentiary] hearing.

On June 23, 2020, [Attorney Mark F. Bayley ("Attorney Bayley")] was appointed to represent [Appellant]. Attorney Bayley subsequently requested several transcripts and filed a motion for leave to file [an] amended petition once all transcripts were received[. The PCRA court subsequently] granted the motion. On January 8, 2021, Attorney Bayley filed a motion [] to withdraw [as Appellant's counsel], along with a [***Turner/Finley***] no[-]merit letter.

On January 28, 2021, [the PCRA court] entered an order scheduling an evidentiary hearing on [Appellant's] petition for March 4, 2021. [The PCRA court] clarified that the hearing was [] limited to the issues concerning [District Attorney Travis Kendall's] potential conflict of interest [in prosecuting Appellant's underlying criminal matter] and the failure to call certain witnesses [at trial. The PCRA court further] indicated that the issue regarding [Attorney Mooney's] failure to pursue certain suppression issues would be decided without [an] evidentiary hearing. On February 16, 2021, [Appellant] filed a motion for [a] continuance and [a] motion for [the evidentiary] hearing to be conducted *via* [an Internet-based video conferencing application. The PCRA court] granted the motion[s] and continued the hearing until May 6, 2021, [with the hearing] to take place [*via* a video conferencing application]. On April 29, 2021, upon the [PCRA] court's own motion, [the evidentiary hearing was] rescheduled [for] July 15, 2021[.]

On July 15, 2021, [the PCRA court] held an evidentiary hearing *via* [a video conferencing application], where [Appellant] presented testimony from Attorney [] Harper and Attorney [] Mooney[. Appellant] also testified at the hearing. However, two additional defense witnesses [(Randy Cubbage and Joshua Sarver)] were unable to access the virtual hearing. Therefore, [the PCRA court] scheduled a second evidentiary hearing for September 20, 2021, to be held in[-]person.

The second evidentiary hearing was held on September 20, 2021, at which time [Appellant] presented testimony from [] Cubbage.

[Appellant's] remaining witness, [] Sarver, [] failed to appear. Therefore, yet another [evidentiary] hearing was scheduled.

On February 2, 2022, despite personal service by [the] deputy sheriff, [of a subpoena to appear and offer testimony at the evidentiary hearing,] Sarver again failed to appear [at the] evidentiary hearing. Pursuant to 42 Pa.C.S.[A.] § 5904(d), [Appellant] requested that a bench warrant be issued for [] Sarver. For the reasons set forth in [the] order [filed on] February 17, 2022, [the PCRA court] declined to issue a bench warrant. [Thereafter, the PCRA court closed the evidentiary hearing record, and no further testimony or evidence was presented.]

PCRA Court Opinion, 2/24/22, 1-4 (extraneous capitalization omitted). On February 24, 2022, the PCRA court denied Appellant's petition.[3] On March 11, 2022, Appellant filed a notice of appeal.[4] On June 8, 2022, Attorney Bayley filed an **Anders** brief, as discussed *supra*, and a motion to withdraw as court-appointed counsel with this Court.

Appellant raises the following issues for our review:

1. [Did] the [PCRA] court err[] in denying [] Appellant's [PCRA] petition [] where [Attorney Harper and Attorney Mooney] provided ineffective assistance of counsel by failing to formally object to District Attorney [] Kendall prosecuting the case[?]

2. [Did] the [PCRA] court err[] in denying [] Appellant's [PCRA] petition [] where [Attorney] Mooney[] provided ineffective

_____

[3] In the February 24, 2022 order denying Appellant's PCRA petition, the PCRA court informed Appellant of his right to appeal the denial of his petition and that Attorney Bayley "shall continue to serve as court-appointed counsel." PCRA Court Order, 2/24/22. As such, by inference, the PCRA court denied Attorney Bayley's petition to withdraw as counsel.

[4] On April 4, 2022, Appellant filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The PCRA court subsequently filed a Rule 1925(a) opinion relying on its February 24, 2022 opinion.

assistance of counsel by failing to call [] Sarver [as a witness] at trial[?]

3.    [Did] the [PCRA] court err[] in denying [] Appellant's [PCRA] petition [] where [Attorney] Mooney[] provided ineffective assistance of counsel by failing to call [] Cubbage [as a witness] at trial[?]

4.    [Did] the [PCRA] court err[] in denying [] Appellant's [PCRA] petition [] where [Attorney] Mooney[] provided ineffective assistance of counsel by failing to call [] Karen Amos [as a witness] at trial[?]

5.    [Did] the [PCRA] court err[] in denying [] Appellant's [PCRA] petition [] where [Attorney] Harper[] provided ineffective assistance of counsel by failing to argue the facts and case law in his brief submitted to the trial court on March 15, 2018, and during his [direct] appeal to [this Court?]

Appellant's Brief at 7-8 (extraneous capitalization omitted).

Preliminarily, we must address Attorney Bayley's motion to withdraw as counsel before addressing the merits of the claims raised on appeal. As discussed *supra*, because this appeal is from the denial of collateral relief under the PCRA, a **Turner**/**Finley** no-merit letter or brief is the appropriate filing. Although we accepted Attorney Bayley's **Anders** brief *in lieu* of a **Turner**/**Finley** brief, counsel is still required to adhere to all of the **Turner**/**Finley** requirements, stated as follows:

Counsel petitioning to withdraw from PCRA representation must proceed under **Turner**, **supra**[,] and **Finley**, **supra**[,] and must review the case zealously. **Turner**/**Finley** counsel must then submit a "no-merit" letter to the trial court, or brief on appeal to this Court, detailing the nature and extent of counsel's diligent review of the case, listing the issues which petitioner wants to have reviewed, explaining why and how those issues lack merit, and requesting permission to withdraw.

- 6 -

> Counsel must also send to the petitioner: (1) a copy of the "no[-]merit" letter/brief; (2) a copy of counsel's petition to withdraw; and (3) a statement advising petitioner of the right to proceed *pro se* or by new counsel.
>
> Where counsel submits a petition and no-merit letter that satisfy the technical demands of **Turner**/**Finley**, the court – [PCRA] court or this Court - must then conduct its own review of the merits of the case. If the court agrees with counsel that the claims are without merit, the court will permit counsel to withdraw and deny relief.

**Commonwealth v. Doty**, 48 A.3d 451, 454 (Pa. Super. 2012) (original brackets and ellipses omitted), *quoting* **Commonwealth v. Wrecks**, 931 A.2d 717, 721 (Pa. Super. 2007).

Instantly, Attorney Bayley satisfied the technical requirements of **Turner**/**Finley**. In his appellate brief, counsel raised five issues for our review and explained how and why those issues are each without merit. Appellant's Brief at 7-8, 11-26. Counsel also filed a motion to withdraw with this Court on June 8, 2022. As an exhibit to his motion, counsel attached a letter to Appellant that enclosed a copy of counsel's no-merit brief, included a copy of counsel's motion to withdraw, and advised Appellant of his right to proceed *pro se* or retain new counsel. Appellant has not filed a response to counsel's letter, the appellate brief, or the motion to withdraw. Accordingly, we proceed to conduct an independent review of the record to determine if the appeal lacks merit.

In addressing Appellant's issues, we are mindful of our well-settled standard and scope of review of an order denying a PCRA petition. Proper appellate review of a PCRA court's denial of a petition is limited to the

examination of "whether the PCRA court's determination is supported by the record and free of legal error." *Commonwealth v. Miller*, 102 A.3d 988, 992 (Pa. Super. 2014) (citation omitted). "The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record." *Commonwealth v. Lawson*, 90 A.3d 1, 4 (Pa. Super. 2014) (citations omitted). "This Court grants great deference to the findings of the PCRA court, and we will not disturb those findings merely because the record could support a contrary holding." *Commonwealth v. Hickman*, 799 A.2d 136, 140 (Pa. Super. 2002) (citation omitted). In contrast, we review the PCRA court's legal conclusions *de novo*. *Commonwealth v. Henkel*, 90 A.3d 16, 20 (Pa. Super. 2014) (*en banc*), *appeal denied*, 101 A.3d 785 (Pa. 2014).

Appellant's issues, *in tantum*, raise claims alleging that that trial counsel and direct appeal counsel provided ineffective assistance. Appellant's Brief at 7-8. "It is well-established that counsel is presumed effective[.]" *Commonwealth v. Koehler*, 36 A.3d 121, 132 (Pa. 2012), *citing Strickland v. Washington*, 466 U.S. 668, 687-691 (1984). To plead and prove a claim of ineffective assistance of counsel, "a petitioner must establish: (1) that the underlying issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice resulted from counsel's act or failure to act." *Commonwealth v. Stewart*, 84 A.3d 701, 706 (Pa. Super. 2013) (*en banc*), *appeal denied*, 93 A.3d 463 (Pa. 2014). "A claim of ineffectiveness will be denied if the petitioner's evidence fails to meet any of these prongs." *Commonwealth v. Martin*, 5 A.3d 177, 183 (Pa. 2010). "In

determining whether counsel's action was reasonable, we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis." ***Commonwealth v. Washington***, 927 A.2d 586, 594 (Pa. 2007).

> Our inquiry ceases and counsel's assistance is deemed constitutionally effective once we are able to conclude that the particular course chosen by counsel had some reasonable basis designed to effectuate his[, or her,] client's interests. The test is not whether other alternatives were more reasonable, employing a hindsight evaluation of the record. Although weigh the alternatives we must, the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decision had any reasonable basis.

***Commonwealth v. Pierce***, 527 A.2d 973, 975 (Pa. 1987). A petitioner establishes prejudice when he demonstrates "that there is a reasonable probability that, but for counsel's [acts or omissions], the result of the proceeding would have been different." ***Commonwealth v. Johnson***, 966 A.2d 523, 533 (Pa. 2009).

Appellant's first issue alleges that both trial counsel and direct appeal counsel rendered ineffective assistance in failing to challenge District Attorney Kendall's prosecution of Appellant's case. Appellant's Brief at 11-18. Appellant asserts that,

> Prior to serving as the Fulton County District Attorney, Attorney Kendall represented [Appellant] in a substantially similar case in or around 2005. [Appellant] asserts that [District] Attorney Kendall should have [] recognized his conflict of interest in prosecuting the current case, because of how similar the 2005 case was[.]

- 9 -

Appellant's Amended PCRA Petition, 3/17/20, at ¶22.[5]   Appellant contends

that "District Attorney Kendall made mention of the 2005 case, which was

dismissed, during arguments made to the [trial] court [regarding the]

reduction of [Appellant's] bail, and [at the sentencing hearing] to justify the

Commonwealth's [sentencing request.]"  ***Id.*** at ¶23.

> A prosecution is barred when an actual conflict of interest affecting the prosecutor exists in the case[.  U]nder such circumstances a defendant need not prove actual prejudice in order to require that the conflict be removed.  Mere allegations of a conflict of interest, however, are insufficient to require replacement of a district attorney.

***Commonwealth v. Orie***, 88 A.3d 983, 1021 (Pa. Super. 2014) (citations and

quotation marks omitted), *appeal denied*, 99 A.3d 925 (Pa. 2014).

Pennsylvania Rule of Professional Conduct 1.9, which defines the term

"conflict of interest" within the practice of law, states, in pertinent part, as

follows:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent.

Pa.R.P.C. 1.9(a).

---

[5] In his *pro se* PCRA petition, Appellant asserted that because District Attorney Kendall previously represented Appellant in private practice, District Attorney Kendall "[knew] everything about [Appellant]" which gave the Commonwealth a "gain" in convicting Appellant of the criminal charges in the case *sub judice*. Appellant's *Pro Se* PCRA Petition, 8/26/19, at 4.

For purposes of Rule 1.9, matters are "substantially related" if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter.

*Commonwealth v. Ford*, 122 A.3d 414, 416 (Pa. Super. 2015), *relying on*

Rule 1.9, Official Comment.

Here, the PCRA court summarized District Attorney Kendall's prior involvement as Appellant's privately-retained counsel as follows:

A [criminal] complaint was filed against [Appellant] on July 6, 2005, charging him with two counts of intentional possession of [a] controlled substance by person not registered, [35 P.S. § 780-113(a)(16),] and two counts of use/possession of drug paraphernalia[, 35 P.S. § 780-113(a)(32)]. The affidavit of probable cause explained that [police officers] responded to [Appellant's residence] in Needmore, Fulton County, upon report of an unconscious female. The victim was deceased by the time the police [officers] arrived. The Fulton County coroner was called to investigate and discovered drugs and drug paraphernalia in the room where the woman died. The [police officers] recovered small vials of heroin and marijuana plants [from] around the room, as well as several items associated with drug use, including a metal spoon and metal smoking device, each containing residue[. A police] officer collected these items and sent them for testing. Testing confirmed that all [items seized in Appellant's residence contained the residue of] controlled substances. During the investigation into the woman's death, [Appellant] provided a statement to [the police officers] admitting ownership of the recovered drugs.

. . .

On June 6, 2006, Attorney Kendall filed o*mnibus* pre-trial motions on behalf of [Appellant], alleging that the drug paraphernalia was discovered during an illegal, warrantless[] search of [Appellant's] property[. Attorney Kendall] also argued [that Appellant's] statements to [the] police [officers] should be suppressed as fruit of the illegal search. The [trial] court issued an opinion and order

- 11 -

on September 25, 2006, granting [Appellant's] motion as to the heroin, marijuana, needles, glass vials, rolling papers, and metal smoking device[. T]he motion was denied as to the rubber tubing and metal spoon.

On April 17, 2007, the Commonwealth *nolle prossed* all charges against [Appellant.]

PCRA Court Opinion, 2/24/22, at 6-7.

At the PCRA evidentiary hearing, Attorney Mooney recalled that, at the time of trial, he was aware District Attorney Kendall previously served as Appellant privately-retained defense counsel during an earlier criminal prosecution. In fact, Attorney Mooney discussed the matter with Appellant. N.T., 7/15/21, at 12-13 (stating that, Appellant raised the issue of District Attorney Kendall's prior representation). In these discussions, Attorney Mooney informed Appellant that if he successfully challenged the local district attorney's fitness to prosecute the pending criminal charges, the Attorney General for the Commonwealth of Pennsylvania would take over prosecution of the criminal case. *Id.* at 12. Attorney Mooney stated that both he and Appellant "thought [Appellant] may be better off with local [d]istrict [a]ttorney presence rather than the Attorney General's office." *Id.* at 12-13. Attorney Mooney testified that, ultimately, Appellant decided not to pursue disqualification of District Attorney Kendall or his office from prosecution of Appellant's pending criminal case. *Id.* at 13-14.

Appellant testified that he initially raised District Attorney Kendall's prior representation with Attorney Harper, who at that point had been appointed to

represent Appellant at trial.[6] *Id.* at 34. Appellant stated he did not ask Attorney Harper to raise the issue because Appellant hired Attorney Mooney to represent him. *Id.* Appellant recalled discussing "the pros and cons of [District] Attorney Kendall continuing on as prosecutor in [the instant] case" with Attorney Mooney. *Id.* at 36. At the evidentiary hearing, Appellant was asked what confidential information he provided to Attorney Kendall during the prior case that could have been used against him in the case *sub judice*. Appellant responded,

> That we [(Appellant and the victim in the prior criminal case)] were injecting each other back then, you know, and it could be used against me so [District Attorney Kendall] could sit there and bring up the other cases back then that, you know, we injected each other. So it could have put me as I killed her and stuff but I didn't inject her at that time.

*Id.* at 42.

Based upon a review of the record before us, we discern no error of law or abuse of discretion in the PCRA court's denial of Appellant's ineffectiveness claim challenging trial counsel's failure to seek disqualification of District Attorney Kendall and his office from prosecution in the underlying criminal case. Appellant failed to establish that trial counsel's actions lacked an

---

[6] For clarification, Attorney Harper was originally appointed to represent Appellant at trial. Appellant subsequently retained Attorney Mooney as privately-retained defense counsel for purposes of trial. After Appellant was convicted and sentenced, as discussed *supra*, Attorney Harper was appointed to represent Appellant in the post-sentence motion and direct appeal phases of the case.

objective reasonable basis. Both Appellant and Attorney Mooney testified that they discussed Attorney Kendall's prior representation. As part of their "pros and cons" discussion, Attorney Mooney explained the consequences of District Attorney Kendall's disqualification, including the likelihood that Appellant's case would be prosecuted by the Pennsylvania Attorney General. Attorney Mooney believed, and Appellant agreed, that it was in Appellant's best interest to have the case prosecuted by the local district attorney. Ultimately, since Appellant chose to forgo disqualification of District Attorney Kendall to avoid potentially adverse consequences, we agree that trial counsel was not ineffective.

Because Appellant elected not to object to District Attorney Kendall's prosecution of the criminal case, no meritorious claim could have been raised for the first time on direct appeal. *See* Pa.R.A.P. 302(a) (stating, "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal"). Therefore, Appellant's ineffectiveness claim lodged against direct appeal counsel is also without reasonable merit. Moreover, the allegation that direct appeal counsel was ineffective for failing to raise the issue in a post-sentence motion is also without merit. As discussed *supra*, trial counsel had a reasonable basis for declining to object to District Attorney Kendall's prosecution of the case and direct appeal counsel cannot be ineffective for failing to raise an unpreserved claim that lacked merit. ***Commonwealth v. Rivera***, 199 A.3d 365, 374 (Pa. 2018) (stating that, if the underlying claim is

without merit, counsel cannot be found ineffective for failing to raise a meritless claim).

Appellant's next three issues allege that trial counsel was ineffective in failing to call, at trial, three potential witnesses, namely Sarver, Cubbage, and Amos. Appellant's Brief at 18-24.

To reiterate, the three prongs of an ineffectiveness claim are: (1) arguable merit, (2) lack of reasonable basis or strategy, and (3) prejudice. **Stewart**, 84 A.3d at 706. To establish the arguable merit prong of the three-prong ineffectiveness test based on a failure to call a potential witness to testify at trial, the petitioner must prove that:

> (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

**Commonwealth v. Matias**, 63 A.3d 807, 810-811 (Pa. Super. 2013) (citations omitted), *appeal denied*, 74 A.3d 1030 (Pa. 2013). In this context, to establish prejudice, the petitioner "must show how the [potential witness's] testimony would have been beneficial under the circumstances of the case" and "helpful to the defense" such that the absence of the testimony denied the petitioner a fair trial. ***Id.*** at 811 (citation omitted); ***see also Commonwealth v. Chmiel***, 889 A.2d 501, 546 (Pa. 2005) (holding, "[t]rial counsel's failure to call a [potential witness] does not constitute ineffective assistance without some showing that the [potential] witness'[s] testimony

- 15 -

would have been beneficial or helpful in establishing the asserted defense"), *cert. denied*, 549 U.S. 848 (2006).

In addition to establishing arguable merit, a petitioner must also demonstrate that there was no reasonable basis for failing to call a potential witness and that the failure to call a potential witness prejudiced the petitioner such that there was a reasonable probability that the witness's testimony would have resulted in a different outcome at trial. **Stewart**, 84 A.3d at 706; **see also Commonwealth v. Robinson**, 278 A.3d 336, 345-349 (Pa. Super. 2022).

Regarding the aforementioned three potential witnesses, the PCRA court found that Attorney Mooney had a reasonable basis for not calling each of the potential witnesses at trial. Appellant's Brief at 16, 19-20. In the case of Amos, the PCRA court stated,

> Attorney Mooney explained that in his opinion, not much of Amos' potential testimony would be useful. In fact, the most useful thing Amos could say was that [Appellant] was not the drug kingpin, but was just "part of the party." Significantly, according to Attorney Mooney, Amos was not convinced that [Appellant] had not supplied the victim with heroin on the day he died. Further, both of the other individuals with [Appellant] and [the victim on the day of the incident] admitted at trial that they were drug users or [drug] dealers in their own right; one even admitted to having previously been arrested in a drug deal. In [Attorney Mooney's] view, having Amos testify would not have been favorable to the defense, especially in light of the Commonwealth's ability to then cross-examine her. Specifically, Attorney Mooney felt it was best not to have Amos testify because doing so would have opened the door for the Commonwealth to introduce information about damaging phone calls between [Appellant] and Amos. . . . While Attorney Mooney discussed the positives and negatives of calling Amos at trial, it was [Appellant] who ultimately decided not to.

PCRA Court Opinion, 2/24/22, at 15-16 (paragraph formatting modified).

Concerning Cubbage, the PCRA court stated,

[Attorney Mooney] testified that the purpose of calling Cubbage would have been to attack the other two individuals[, who were with Appellant and the victim on the day of the incident,[7]] as being drug users or drug dealers themselves. According to Attorney Mooney, once [the two individuals] admitted as much during trial, it took a lot of impetus out of the usefulness of Cubbage's testimony. Attorney Mooney testified that, at that point, bringing in more drug users would paint an even worse picture of [Appellant]. Lastly, Attorney Mooney testified that [Appellant] was involved in the decision not to call more drug users[ or drug ]dealers to the stand.

. . .

Cubbage's testimony at the [evidentiary] hearing, while providing basic background information, was unclear with respect to what he would have testified about had he been called as a witness at [Appellant's] trial. Without any information [concerning] the testimony he would have given, we cannot [] begin to speculate as to whether that testimony would have been favorable to the defense.

In addition, Attorney Mooney made a strategic decision not to offer Cubbage's testimony, as doing so would have allowed the [Commonwealth] to extract damaging information from him regarding [Appellant's] various drug activities. This was a prudent and reasonable decision. Moreover, to the extent Cubbage's testimony would have been beneficial in showing that the other two individuals with [the victim] and [Appellant on the day of the incident] were also involved with drugs, such usefulness was diminished when that information came out during trial [without Cubbage's testimony]. At trial, [the two individuals with Appellant and the victim on the day of the incident] both testified that they, along with [the victim], were heroin addicts who frequently sold heroin for [Appellant] in exchange for a small amount of heroin they could keep for personal use. They also testified that on the day in question, they, along with [the victim], were experiencing

_____

[7] Cubbage was not present at Appellant's residence on the day of the incident.

heroin withdrawal and went to [Appellant's] house to obtain and use heroin.

*Id.* at 18-19 (record citations omitted).

Finally, with regard to Sarver, the PCRA court stated,

Attorney Mooney testified that the purpose of calling Sarver would have been to attack the other two individuals[, who were with the victim and Appellant on the day of the incident,[8]] as being drug users or drug dealers themselves[. H]owever, once [the two individuals] admitted as much during trial, it took a lot of the usefulness out of Sarver's testimony. Again, Attorney Mooney testified that, at that point, bringing even more drug users before the jury painted an even worse picture for [Appellant]. Lastly, Attorney Mooney testified that [Appellant] was involved in the decision not to call more drug users[ or drug ]dealers to the stand.

*Id.* at 20. Moreover, the PCRA court found that,

Sarver's testimony at trial would likely not have survived a relevance [or] speculation objection raised by the [Commonwealth]. There is no evidence in the record that Sarver was present at [Appellant's] home on the day in question. What Sarver may have observed on other days about [Appellant's] drug-sharing activities is [] likely not relevant to what happened on the day [the victim] died in [Appellant's] home. In addition, any suggestion by Sarver that [Appellant] and [the victim] engaged in similar drug-sharing behavior on the day in question would be no more than rank speculation.

*Id.*, *citing* PCRA Court Order, 2/17/22, at 4.

At the criminal trial, Attorney Mooney summarized Appellant's defense

as follows,

[T]here is no credible evidence that [Appellant] distributed, handled, injected, administered, dispensed, [or] sold [] controlled

---

[8] Sarver was not present at Appellant's residence on the day of the incident.

substances to [the victim]. A more logical explanation [of the events on the day of the incident] is [Appellant's residence] was [the chosen destination of the victim and the other two individuals. They] brought [their] kits [for using drugs. They] sold some packs [of drugs] earlier in the day. [It was] time for [them] to feel good again.

N.T., 10/6/17, at 41. At the PCRA evidentiary hearing, Attorney Mooney testified that, in his discussions with Appellant about the pros and cons of calling any of these three potential witnesses at trial, he expressed that presenting more witnesses who were within Appellant's circle of drug users and drug dealers "was painting a worse picture" for the defense. N.T., 7/15/21, at 26. Ultimately, Appellant decided not to call the three individuals as potential witnesses at trial. *Id.* at 22, 26. Attorney Mooney stated that the most useful testimony Amos could have offered was to state that Appellant was not a "drug king pin" but, rather, simply part of a group of people who partied and used drugs. *Id.* at 17. This testimony, Attorney Mooney explained, was not, in his opinion, helpful and would only subject Amos to cross-examination by the Commonwealth. *Id.* at 15, 17. Attorney Mooney recalled that calling Amos risked introduction of "hours and hours" of telephone conversations between Amos and Appellant in which Appellant directed Amos to "collect money that they were owed by people to whom [Appellant] had sold drugs."[9] *Id.* at 23 (describing the taped conversations as "the worst conversations I have heard in 37 years of being a criminal

---

[9] At trial, the Commonwealth introduced into evidence three portions of taped conversations between Appellant and Amos, which were played for the jury. N.T., 10/5/17, at 154-163; *see also* N.T., 10/6/17, at 3-5.

defense" attorney). At trial, the audio evidence of Appellant's conversations with Amos was redacted to three small portions as a result of Attorney Mooney's hearsay objections. N.T., 10/5/17, at 154-163 (admitting those portions of the conversation in which Amos' comments were "purely incidental" and "not testimonial"). Attorney Mooney was concerned that if Amos testified at trial, the Commonwealth would be able to introduce additional portions of her telephone conversations with Appellant. N.T., 7/15/21, at 24. Attorney Mooney stated that having more of the conversation presented to the jury would outweigh any useful testimony Amos may have offered. *Id.* (stating, "[i]t was mountains of more bad information that the jury would have heard").

Concerning Cubbage and Sarver, Attorney Mooney agreed that one reason to call those witnesses was to attack or discredit the two individuals who were with Appellant and the victim the day of the incident "as being drug users and drug dealers themselves." *Id.* at 25. Both Cubbage and Sarver purchased drugs from the two individuals at some point prior to the incident. *Id.* The importance of Cubbage's or Sarver's testimony was greatly diminished, however, once the two individuals admitted, at trial, that they were drug dealers. *Id.* Attorney Mooney reiterated that, at this point, calling either Cubbage or Sarver as a witness was "bringing more druggies into the circle [] of people who used drugs and brought drugs and sold drugs [] with [Appellant and that] was not making it better" for Appellant's case. *Id.* at 26.

Upon review, we discern no error of law or abuse of discretion in the PCRA court's denial of Appellant's ineffectiveness claims challenging trial counsel's failure to call Amos, Cubbage, or Sarver as potential witnesses at trial. The PCRA court found, and the record supports, that trial counsel offered reasonable explanations for not calling these potential witnesses. As such, Appellant's issues are without merit.

In his final issue, Appellant alleges that direct appeal counsel was ineffective for failing to challenge, within the context of a post-sentence motion or on direct appeal, the trial court's denial of his *omnibus* motion which sought to suppress certain evidence seized from Appellant's residence, as well as his cellular telephone and statements Appellant made to law enforcement officials on the day of the incident. Appellant's Brief at 7-8, 24-26.

In order to establish this ineffectiveness claim, Appellant must plead and prove by a preponderance of the evidence that, *inter alia*, his underlying suppression claims possessed arguable merit. **Stewart**, 84 A.3d at 706.

To address Appellant's ineffectiveness claim, we briefly discuss the procedural history pertinent to the underlying suppression motion. On December 20, 2016, Attorney Mooney filed an *omnibus* motion seeking to suppress certain evidence seized on the day of the incident, namely evidence taken from Appellant's residence, Appellant's cellular telephone, and statements Appellant made to law enforcement at his residence. *Omnibus* Pre-Trial Motion, 12/20/16. The trial court conducted a hearing on Appellant's *omnibus* motion on February 14, 2017, and subsequently directed counsel and

the Commonwealth to file written arguments on the issues presented no later than March 7, 2017. Trial Court Order, 2/16/17. The Commonwealth filed a brief in opposition to Appellant's *omnibus* motion on March 6, 2017. Attorney Mooney filed a brief in support of the *omnibus* motion on March 8, 2017, which the trial court accepted as timely. On April 4, 2017, the trial court denied Appellant's *omnibus* motion. Trial Court Order, 4/4/17; **see also** Trial Court Opinion, 4/4/17.

After Appellant was convicted of the aforementioned crimes and the trial court imposed its sentence, as discussed *supra*, Attorney Mooney filed a post-sentence motion on November 5, 2017. On February 8, 2018, Attorney Harper represented to the trial court that Appellant sought the services of the public defender's office and that Attorney Mooney no longer represented Appellant. Appellant's Motion for Extension of Time to Submit Written Argument in Support of Post-Sentence Motion, 2/8/18, at ¶¶5-6; **see also** Attorney Mooney's *Praecipe* for Withdrawal of Appearance, 2/16/18. On March 12, 2018, the Commonwealth filed a brief in opposition to Appellant's post-sentence motion. On March 15, 2018, Attorney Harper filed a brief in support of Appellant's post-sentence motion.[10] The trial court denied the

_____

[10] In the brief, Attorney Harper stated,

> [Appellant] raises a request for [a] new trial based upon the [trial court's error in refusing] to suppress evidence of [cellular telephones] obtained at the scene of the alleged crime and evidence of telephone calls between [Appellant] and [Amos] while

post-sentence motion on April 3, 2018. On direct appeal, Attorney Harper raised claims challenging the sufficiency of the evidence, the weight of the evidence, and the excessive nature of Appellant's sentence. *Maness*, 2018 WL 6715297, at *1. Attorney Harper did not raise a claim challenging the trial court's denial of the *omnibus* motion. *Id.*; *see also* Appellant's Rule 1925(b) Concise Statement, 5/29/18.

In the instant appeal, Appellant now claims that direct appeal counsel was ineffective for failing to challenge the denial of his *omnibus* motion in the post-sentence motion or on direct appeal. Appellant's Brief at 24-26. To review Appellant's ineffectiveness claim, we must first review the underlying claim to assess whether underlying suppression issues have merit. *See Rivera*, 199 A.3d at 374.

In his *omnibus* motion, Appellant conceded that Trooper Bradley Huff ("Trooper Huff") was lawfully present in the residence because he was responding to a 911 emergency services request regarding the victim's possible overdose. *Omnibus* Motion, 12/20/16, at ¶11. Appellant asserted,

---

[Appellant] was incarcerated. On review of the record in this case and the trial transcripts, in particular, [pages 108 to 121 of the notes of testimony dated October 5, 2017,] the undersigned [(Attorney Harper)], without further information, is unable to support the validity of this claim given the agreements and stipulations of [trial] counsel, the [d]istrict [a]ttorney[,] and *in*[-]*camera* testimony of witnesses. Therefore[,] it is requested to raise this issue on further appeal, if necessary.

Appellant's Argument in Support of Post-Sentence Motions, 3/15/18, at unpaginated page 2.

- 23 -

however, that "no other exception to the warrant requirement is present to justify the warrantless search of [Appellant's residence]." *Id.* Specifically, Appellant argued that the evidence cited in the affidavit of probable cause and offered in support of the search warrant – namely a bag of short cut straws discovered in a flowerpot, an uncapped hypodermic needle located behind a picture frame, and a hypodermic needle and caps recovered from a trash can - was unlawfully seized by Trooper Huff because it was not in plain view, and no other exception applied.[11] *Id.* at ¶¶12, 16. Appellant further asserted that there were no exigent circumstances which justified Trooper Huff's seizure of Appellant's cellular telephone before obtaining a warrant. *Id.* at ¶¶12-14, 17, 19-28. Finally, Appellant argued that statements he made to Trooper Huff while at the residence were illegally obtained because they were made while Appellant was in custodial detention and without issuance of *Miranda* warnings.[12] *Id.* at 29-36.

In denying Appellant's *omnibus* motion, the trial court found,

[Trooper Huff[13]] was dispatched to [Appellant's] residence in response to a 911 [emergency services] call for an unresponsive

---

[11] In his *omnibus* motion, Appellant asserted that the items seized from his residence included: (1) "a bundle of short cut straws in a potted plant in a living room," (2) "an uncapped hypodermic needle behind a picture frame on a table," and (3) "a hypodermic needle and caps in the trash can underneath paper towels with possibly fresh blood." *Omnibus* Motion, 12/20/16, at ¶12.

[12] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[13] Trooper Huff, at that time, was "an eight-year veteran of the Pennsylvania State Police." Trial Court Opinion, 4/4/17, at 1.

individual. When he entered the [residence], he observed [the victim] lying on the living room floor and being attended to by [emergency medical services ("EMS")] personnel. He also observed the hypodermic needle and the cut straw pieces in plain view, without conducting any kind of search of the home. The photographs introduced as Commonwealth's exhibits 1 through 5 capture the scene as Trooper Huff viewed it upon his entry. The location of the orange-capped hypodermic needle on the table behind the framed photograph and the [flowerpot] containing the plastic bag of straw pieces are clearly within just a few feet of [the victim's] body. The items were not obscured and were capable of being plainly seen from the trooper's location. Further, given [the victim's] apparent drug overdose and Trooper Huff's training and experience, the incriminating nature of the items was immediately apparent. Finally, Trooper Huff did not actually seize the property until after he obtained a warrant to search the residence.

. . .

Trooper Huff, at the suggestion of another trooper arriving at the scene, took [Appellant's cellular telephone] and secured it in his patrol vehicle to prevent the individuals involved from using their [cellular telephones] to collaborate and align their version[s] of events, as well as to preserve any evidence that may be on the [cellular telephones.] Certainly [Appellant] understood at the time that Trooper Huff believed [the victim] to have expired after a drug (possibly heroin) overdose, based on the questions Trooper Huff asked [Appellant] during the conversation which had taken place just prior to Trooper Huff collecting the [cellular telephones]. Trooper Huff was aware that illegal drug transactions are often set up through the use of a [cellular telephone]. Trooper Huff was concerned that evidence on the [cellular telephones] could be remotely accessed and deleted – either intentionally or unintentionally through the normal course of use. [Appellant's cellular telephone] was placed in airplane mode, indicating that [the cellular telephone] would not have been receiving new calls or [text] messages viewable by the police in the time [the cellular telephone] was in police custody and prior to the issuance of a warrant. Once it was secured, the contents and data on [Appellant's cellular telephone were] not searched or accessed until the warrant was obtained. The warrant was obtained without delay and within a very short time of Trooper Huff securing the [cellular telephone.]

. . .

[The trial court] cannot find that [Appellant] was subjected to a custodial interrogation with attendant conditions so coercive as to constitute the functional equivalent of an arrest. However, it is also not consistent with the totality of the circumstances to suggest that [Appellant's] interaction with Trooper Huff was no more than a mere encounter. Rather, the totality of the circumstances support a finding that [Appellant] was subjected to an investigative detention which must be supported by reasonable suspicion.[FN9]

> [Footnote 9] There does not seem to be any suggestion that Trooper Huff would not have possessed reasonable suspicion to detain [Appellant]. After all, [the victim] was lying on [Appellant's] living room floor, dead of an apparent drug overdose.

Looking more closely at the evidence, the interaction took place on the porch of [Appellant's residence] after [Appellant] called 911 and personally summoned emergency assistance, which included the police, to his home. Trooper Huff responded to the scene, observed the unsuccessful efforts to revive [the victim], and began questioning all individuals present, including [Appellant] about what happened to [the victim. Appellant] was not handcuffed or otherwise restrained during the brief conversation. Finally, [Appellant] agreed to come to the [state police] barracks, on his own, for a more formal interview. As we cannot find that [Appellant] was in custody during the time he spoke to Trooper Huff, *Miranda* warnings were not required.

Trial Court Opinion, 4/4/17, at 6-12 (record citation omitted). For the reasons that follow, we agree with the trial court that the items relied upon in support of the affidavit of probable cause for issuance of the search warrant, Appellant's cellular telephone, and statements Appellant made while at his residence were lawfully obtained.

It is well-settled that,

[a] search conducted without a warrant is deemed to be unreasonable and[,] therefore[,] constitutionally impermissible, unless an established exception applies. Exceptions to the warrant requirement include the consent exception, the plain view

- 26 -

exception, the inventory search exception, the exigent circumstances exception, the automobile exception[,] the stop and frisk exception, and the search incident to arrest exception.

***Commonwealth v. Simonson***, 148 A.3d 792, 797 (Pa. Super. 2016) (quotation marks and citations omitted), *appeal denied*, 169 A.3d 33 (Pa. 2017).  As noted, one exception to the need to obtain a search warrant is the plain-view doctrine.

> The plain-view doctrine permits the warrantless seizure of an object when: (1) [a police] officer views the object from a lawful vantage point; (2) it is immediately apparent to [the police officer] that the object is incriminating; and (3) the [police] officer has a lawful right of access to the object.  There can be no reasonable expectation of privacy in an object that is in plain view.  To judge whether the incriminating nature of an object was immediately apparent to the police officer, reviewing courts must consider the totality of the circumstances.  In viewing the totality of the circumstances, the [police] officer's training and experience should be considered.

***Commonwealth v. Bumbarger***, 231 A.3d 10, 20 (Pa. Super. 2020) (citations and quotation marks omitted), *appeal denied*, 239 A.3d 20 (Pa. 2020).

With regard to cellular telephones, law enforcement officers are constitutionally permitted "to seize and secure [but not access cellular telephones] in order to prevent the destruction of evidence during the time it takes to obtain a valid search warrant."  ***Commonwealth v. Stem***, 96 A.3d 407, 411 (Pa. Super. 2014) (noting that, "once law enforcement officers have secured a cell[ular] telephone, there is no longer any risk that the arrestee [] will be able to delete incriminating data from the phone"), *relying on **Riley v.***

*California*, 573 U.S. 373, 388 (2014); *see also Commonwealth v. Goldstein*, 2020 WL 3172663, at *6 (Pa. Super. 2020) (unpublished memorandum) (noting that, exigent circumstances must justify the seizure of the cellular telephone and a valid search warrant must be obtained within a reasonable amount of time); *Commonwealth v. Trahey*, 228 A.3d 520, 530 (Pa. 2020) (stating that, "[a]lthough an exigency may present itself in a variety of contexts, its defining trait is a compelling need for official action [to prevent the imminent destruction of evidence] and no time to secure a warrant" (citations and original quotation marks omitted)).  In order to access information stored on a cellular telephone, however, law enforcement officers must first obtain a warrant, absent "case-specific exceptions" such as consent or exigent circumstances.  *Commonwealth v. Fulton*, 179 A.3d 475, 487 and n.18 (Pa. 2018) (explaining that, law enforcement accesses or searches a cellular telephone when, *inter alia*, the police officer powers on the device, obtains the phone number of the device by navigating the device's menu, or monitors incoming calls and textual messages).

Concerning statements made by a defendant, "*Miranda* warnings are only required when a defendant is subject to a custodial interrogation." *Commonwealth v. Smith*, 836 A.2d 5, 18 (Pa. 2003).  "A person is in custody for purposes of *Miranda* only when the objective circumstances suggest that [he or] she was physically deprived of [his or] her freedom or was in a situation where [he or] she reasonably could have believed that [his or] her freedom of movement was being restricted." *Id.*  In contrast, "the

- 28 -

dictates of **Miranda** do not attach during an investigatory detention."
**Commonwealth v. Murray**, 936 A.2d 76, 81 (Pa. Super. 2007) (stating that,
"under limited circumstances police are justified in investigating a situation,
so long as the police officers reasonably believe that criminal activity is
afoot"). "Statements not made in response to custodial interrogation are
classified as gratuitous and not subject to suppression for lack of **Miranda**
warnings." **Commonwealth v. Coleman**, 204 A.3d 1003, 1008 (Pa. Super.
2019), *appeal denied*, 217 A.3d 205 (Pa. 2019).

Upon review, we discern no error in the trial court's denial of Appellant's
*omnibus* motion to suppress evidence seized from his residence, his cellular
telephone, or statements made at his residence on the day of the incident. At
the suppression hearing, Trooper Huff testified that, upon entering the room
where a drug-overdose victim was being treated by EMS workers, he
immediately noticed drug paraphernalia to be in plain view, which in his
experience he knew to be used in drug packaging for distribution. N.T.,
2/14/17, at 8-11. Specifically, Trooper Huff noted a bundle of red and white
short cut straws in a flowerpot and an uncapped hypodermic needle behind a
picture frame on a table.[14] **Id.**; **see also** Commonwealth Exhibits 1-5.

---

[14] To understand the significance of "short cut straws," our inquiry
demonstrates that one method of using heroin involves "smoking" heroin,
which may be achieved by inhaling the smoke and steam as it wafts off the
liquified heroin through use of a short cut straw. Another common form of
heroin use is through injection *via* a hypodermic needle. **See**
https://americanaddictioncenters.org/heroin-treatment/identifying-parapher
nalia (last visited 10/13/22).

Trooper Huff stated that, upon seeing the aforementioned items in plain view, he did not manipulate the items prior to obtaining a search warrant. N.T., 2/14/17, at 8, 31-32. We concur with the trial court, and the record supports, that items which formed the grounds for issuance of the search warrant were located in Trooper Huff's plain-view from a lawful vantage point and, based upon his training and experience, as well as the victim's apparent drug overdose, the incriminating nature of the items was apparent. Moreover, having been summoned to Appellant's residence to furnish emergency assistance, Trooper Huff possessed lawful access to the unconcealed drug paraphernalia maintained in Appellant's home. Therefore, we discern no error in the trial court's denial of Appellant's *omnibus* motion on this ground.[15]

_____

[15] To the extent that Appellant challenged the hypodermic needle and caps located in a trash can in his *omnibus* motion, a review of the suppression hearing transcript demonstrates that the details of Trooper Huff's observation of this item were not tested on cross-examination. N.T., 2/14/17, at 1-45. Nonetheless, Appellant's argument concerning this item pertains to its use as support for the issuance of a search warrant. *Omnibus* Motion, 12/20/16, at ¶12.

"In order to obtain a valid search warrant, the affiant must establish probable cause to believe that execution of the warrant will lead to the recovery of contraband or evidence of a crime." **Commonwealth v. Caple**, 121 A.3d 511, 520 (Pa. Super. 2015) (citation omitted), *appeal denied*, 179 A.3d 7 (Pa. 2018).

> [T]he task of an issuing authority is simply to make a practical, commonsense decision whether, given all of the circumstances set forth in the affidavit before him, [or her,] including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime

Regarding the taking and securing of Appellant's cellular telephone by Trooper Huff prior to his obtaining a search warrant, we find no error in the trial court's denial of Appellant's *omnibus* motion on this ground. At the suppression hearing, Trooper Huff stated that in his experience, drug deals were typically communicated by using cellular telephone text messaging and telephone calls. N.T., 2/14/17, at 24. As such, cellular telephones were known to contain information that aided law enforcement in its investigation into drug activity, such as the investigation into the victim's cause of death in the case *sub judice*. **Id.** at 24-25. While at the scene of the incident, Trooper Huff observed Appellant and the other individuals present at the time of the

_____

> will be found in a particular place. It is the duty of a court reviewing an issuing authority's probable cause determination to ensure that the [issuing authority] had a substantial basis for concluding that probable cause existed.

**Caple**, 121 A.3d at 520 (citation and ellipsis omitted).

Here, Appellant asserts that the affidavit of probable cause to support the issuance of the search warrant relied on Trooper Huff's discovery of a bundle of short cut straws observed in a flowerpot, an uncapped hypodermic needle located behind a picture frame, and a hypodermic needle and caps in a trash can. *Omnibus* Motion, 12/20/16, at ¶16. Although we are unable to review, based upon the record before us, the validity of Appellant's suppression challenge as it pertains to the hypodermic needle and caps located in the trash can, Appellant failed to demonstrate how he was prejudiced by the failure to suppress those items. The lawful observation of the hypodermic needle located behind the picture frame and the bundle of short cut straws found in the flowerpot, as discussed *supra*, when viewed with the other evidence of record, namely that the victim died of an apparent overdose, gave rise to a substantial basis for concluding that probable cause existed in support of the search warrant absent consideration of the hypodermic needle and caps located in the trach can.

victim's death using their cellular telephones. *Id.* at 22. Trooper Huff believed that Appellant and the other individuals were not truthful regarding the events giving rise to the victim's death and that the individuals, including Appellant, may be communicating *via* their cellular telephones with each other to "get their stories straight" about the events leading to the victim's death. *Id.* at 24. Moreover, Trooper Huff believed, based upon his experience and training, that the cellular telephones may contain incriminating information pertaining to the cause of the victim's death and that Appellant and the other individuals may attempt to remove this information from their cellular telephones prior to discovery by law enforcement. *Id.* To preserve the potentially incriminating information and prevent Appellant and the other parties from communicating about the events leading to the victim's death, Trooper Huff collected Appellant's cellular telephone, placed it in airplane mode, and secured the cellular telephone in his police vehicle.[16] *Id.* at 22-23, 38-40. Trooper Huff testified that he did not view the digital content of Appellant's

_____

[16] Trooper Huff described "airplane mode" as the function of turning off cellular telephone service to a device to prevent in-coming and out-going telephone calls and textual messages and to prevent the cellular telephone from being accessed remotely. N.T., 2/14/17, at 23; *see also Commonwealth v. Bowens*, 265 A.3d 730 758 (Pa. Super. 2021) (noting that, placing a cellular telephone in "airplane mode" prevents the contents of the cellular telephone from being added to or deleted and preserves the contents from changing or becoming stale), *appeal denied*, 279 A.3d 508 (Pa. 2022). Trooper Huff stated that a cellular telephone can be placed in "airplane mode" by "swip[ing] down[ward] from the very top of the [cellular telephone's] scene" without accessing the information on the cellular telephone or viewing a person's information contained on the cellular telephone. N.T., 2/14/17, at 23.

cellular telephone until he obtained a search warrant. *Id.* at 25. We concur with the trial court, and the record supports, that without searching or viewing the information contained on Appellant's cellular telephone, Trooper Huff disabled the device's cellular service and placed the device in his police vehicle in order to preserve the cellular telephone and its contents until a search warrant could be obtained. Under these circumstances, we discern no error in the trial court's denial of the *omnibus* motion on this ground. *See Stem*, 96 A.3d at 411.

Finally, Appellant asserted that his statements made to Trooper Huff while at the residence should have been suppressed because they were made while Appellant was subjected to custodial detention and interrogation and without first being provided his *Miranda* warnings. We disagree.

At the evidentiary hearing, Trooper Huff testified that, at some point shortly after arriving at the scene of the incident, he "asked if [he] could get a statement from each of the people there for [his police] report to find out what happened [since] a dead person [was] laying on the floor [and he] need[ed] to know what happened[.]" N.T., 2/14/17, at 13. Trooper Huff explained that Appellant voluntarily came outside the residence to speak with him privately about the incident and that during their conversation, he did not inform Appellant that he was under arrest, Appellant was not handcuffed or otherwise detained, and prior to and after the conversation, Appellant's movements about the residence were not restricted. *Id.* at 17-18. After Appellant made his initial statements concerning the incident to Trooper Huff

and Trooper Huff completed his interviews of the remaining persons present, Trooper Huff asked Appellant and the others if they were willing to come to the police station to give a formal, written statement. *Id.* at 25. Upon agreeing to provide formal written statements, Appellant and the others transported themselves to the police station in their own vehicle, and even stopped at a grocery store for cigarettes. *Id.* at 25, 37.

An objective review of the circumstances under which Appellant made his statements to Trooper Huff at the residence did not give rise to a custodial detention or interrogation requiring Trooper Huff to provide Appellant with **Miranda** warnings before speaking with him. In particular, Trooper Huff asked Appellant to voluntarily provide a statement of events, and Appellant complied without restriction to his movements or being subjected to detention. Moreover, after speaking with Appellant, Trooper Huff permitted Appellant to continue to move freely about the residence until Appellant drove himself to the police station to provide a formal written statement. As such, we find no error in the trial court's denial of Appellant's *omnibus* motion on this ground.[17]

*In toto*, Appellant's underlying claim challenging the trial court's denial of his *omnibus* motion is without merit for the reasons discussed *supra*. As

---

[17] Furthermore, Appellant concedes in his *omnibus* motion that at the time his cellular telephone was "seized" by Trooper Huff, which occurred **after** Appellant made his statements to Trooper Huff, "no arrests [had been] made" of Appellant. *Omnibus* Motion, 12/20/17, at ¶24.

such, direct appeal counsel cannot be ineffective for failing to raise a frivolous claim in a post-sentence motion or on direct appeal. *Rivera*, 199 A.3d at 374. Consequently, Appellant's ineffectiveness claim on this ground cannot be the basis for collateral relief.

Upon a review of the record, we conclude it supports Attorney Bayley's assessment that Appellant's appeal is wholly frivolous. Moreover, our independent review of the record reveals no additional, non-frivolous claims. Therefore, we grant counsel's petition to withdraw and affirm the order denying Appellant's PCRA petition.

Order affirmed. Petition to withdraw granted.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/30/2022